Your Honor, I'm James Tree and I represent Alex Peterson in a social security disability case. I'd like to reserve three minutes for a rebuttal. Okay, please keep track of your own time. Thank you. Okay. Who is Alex Peterson? Dr. Ulmer was a treating psychologist for many years. He worked at Yakima Neighborhood Health Services and there's hundreds of pages of chart notes. Just a few of them I have here in my hand because they were significant. Because the ALJ didn't mention that Dr. Ulmer was a treating psychologist. He didn't mention the hundreds of pages of chart notes from Yakima Neighborhood Health Services where she received her mental health treatment. He didn't mention that the multiple PHQ-9 tests that were given to her by Yakima Neighborhood Health Services with scores of 20, 21, 25, all representing objective evidence of the most severe depression. On the scale of the PHQ-9 test, a score of 20 or above is in the highest level of severe depression. Below that is moderately severe, moderate, mild, and none. There's plenty of objective evidence in this case to support the opinions of Dr. Ulmer who twice gave disability evaluations in 2018 and 2020 to the Washington State Department of Social Health Services that qualified Alex for Washington State disability assistance. The ALJ, in evaluating the case, made numerous errors. Fundamentally, he didn't understand what fibromyalgia is about, continually saying that neurological, cardiovascular fractures were normal. This had nothing to do with the fibromyalgia case. It had nothing to do with a major depressive disorder case or a bipolar case or post-traumatic stress disorder or anxiety. In our brief, we noted pages and pages of abnormal findings that were found in the chart notes and were found throughout the record, but yet he said that Dr. Ulmer's checkbox report was rejected because it's a checkbox form. That's against, contrary to Ninth Circuit precedent, particularly when you have chart notes that back up those checkbox forms. And in this case, we do. Dr. Ulmer, for example, in the car at 1195 to 1201, gave detailed chart notes where he stated that he knew Ms. Peterson's history. When she was four, she was sexually molested by a cousin. At age 12, her parents divorced and she felt pulled between her parents, both telling her that the other parent was wrong. Up to that time, she was an A student in gifted programs in school. At age 13, she developed fibromyalgia and first diagnosed with fibromyalgia. She started missing school and by 10th grade, had to stop going to school because she was no longer able to attend. She did an online GED program and succeeded. Alex Peterson is a client I am so grateful I met. She fights, the evidence shows in this record that she fights. She's not a quitter. She's had 11 different jobs during this period of disability from 2017 through 2023. She lost all 11 jobs in short order because of her disabilities, but she didn't give up. Help me understand. You used the word lost the jobs. Help me understand as best you can what led to the termination because I saw that. That is to say job after job after job. She works there for two or three months and then she's no longer working there. Was she fired? Did she quit because the stress was too great? I mean, give me a sense as to why the jobs didn't work out. So it was a combination of those things, Your Honor. The record is clear that she testified and she testified at three different hearings because this case has been remanded by the federal court two different times because of errors. But she testified that she had been fired because she was missing too much work. She testified that she asked for accommodations and they weren't given to her and so she had to quit. So it was a combination of her not being able to do the job, too much pain, too much stress, and being fired from several of the jobs. You had mentioned in your discussion about the checkbox reports and of course that's the form they give you, right? Check the box. How many days do you think that this individual would miss per month and then I think as Dr. Briggs and Hardison said three or four days. Are they also obligated to give additional narrative as to backing up the checkbox report? I think so and I think they did. The thing about Dr. Briggs, there's hundreds of pages of his notes and at every visit she was being seen multiple times per week for a significant period of time by the chiropractor Dr. Briggs. And if you'll notice in each chart note he recorded in his chart note what her pain level was for her neck, upper back, mid-back, low back, hands. They were typically from seven to ten. There was a few times when there was improvement and she said I've had some improvement but then if you look at the next chart note it'll come back she's back to the seven to ten range again. There was never any sustained improvement and that's what the federal district court said when they remanded this case the first time is that the ALJ said that she did all these things but when she did them she injured herself. For example, she's 260 pounds, five foot five, BMI of over 40. She reported that she tried to sprint once. She injured herself. Well I also wanted to ask you about the remedy because you have asked for if you were to prevail a remand for award of benefits and I really wondered whether in this case given to do that I think we'd have to say that all the evidence that has been discredited by the ALJ somehow should be taken as true and I wondered if you have some authority for a remand on this basis for a word of benefits or whether given the conflicting evidence and then your view that they really didn't the ALJ didn't focus on some of the issues you've raised whether our law really requires us to remand for reconsideration in effect. Yeah I think in this case if it wasn't for for Dr. Klein and for the ALJ's RFC finding of a interaction with the supervisors on an occasional basis. Those two things I think give strong foundation for a remand for immediate award of benefits because the ALJ he said he gave significant weight to Dr. Klein. There was eight psychologists. Four of them gave moderate limitations in her ability to perform work activities or work or normal work day work week. Four gave marked impairments. The ALJ gave little weight to the four that gave marked impairments. Interestingly from 2018 to the present everybody gave marked impairments. It was just back in 2017 when they gave the moderate impairments and so he says okay I accept everybody that gave the moderate impairments but what's so telling about that on page 17 of our brief we quote the vocational expert testimony because the vocational expert was asked verbatim with these moderate limitations and on the form moderate is defined as a significant limitation marked is defined as a very significant limitation with these moderate limitations which the ALJ ended up accepting and said he gave persuasive weight to from Dr. Klein. The VE said no there's no jobs they could do with those limitations. Matter of fact she had read the record this was Ms. Kramer a VE of some 30 plus years very experienced vocational expert and after being given Dr. Klein's moderate limitations she said long-term no and as exhibited she saw it in the exhibits she was able to attain different positions but was struggling with the six things that you just identified. It's doubtful that with these issues that full-time work would be able to be accomplished and so even with the opinion that the ALJ credited that he said he gave significant weight to she's disabled because the POMS program operating manual of social security system says that the ability to complete a normal work day and week work week is a critical factor and you can't fudge on that. The vocational expert testimony is for an unskilled work you can only miss five to eight days of work per year and if you miss more than that you're going to get fired. There's so many people willing to do unskilled work out there in the community and he said if you miss more than 30 minutes in a day that counts as an absence which goes directly to her need for continual treatment. Excuse me what do we do with the word guess from Dr. Briggs who says I would guess that she's going to miss three a month and the ALJ seizes on that. Now is he merely saying what everybody else just doesn't say there's always a guess. So is that a word that should actually weigh against your client? So in the context of this case I think it's it shouldn't weigh so heavily as I would normally think it might weigh because he also said that's more likely than not and he said you know that it was his professional opinion based upon numerous years of treating her and yes it's not for sure but it was more likely than not. Yeah and what do we do again with this is continues to be Dr. Briggs who basically said well I encourage her to continue treatment rather than to declare for disability. What do we do with that statement? I love that statement. I tell my clients if you can work go to your doctors ask them for permission to work and try. She did and he Dr. Briggs has the same mindset try to work and she did but but she tried 11 times and she never got past six months and under social security rules if your job ends because of your disability within six months it's considered an unsuccessful work attempt. That's why the ALJ said she has no past relevant work at step four. This whole case the burden is shifted to the commissioner because she met her burdens at steps one two three and four. At step five the burden shifts to the commissioner to prove there's other jobs she can do. Counselor you're over time but we took you over time so I'll put a couple minutes on the clock for you for rebuttal. Your honor. Thank you. Good morning Katherine Watson for the commissioner. I'd like to start with Judge McEwen's question regarding Dr. Briggs opinion whether the checkbox form whether the explanations provided on that form is a relevant consideration. The answer to that is yes and the authority for that is Ford v Saul 950 F3D 1141. The pinpoint is 1155. This is a case decided in 2020. One of the reasons the ALJ discounted in that case the treating physician's opinion which was a higher standard than the standard required here. That was under a specific and legitimate reason this is only germane reasons to discount this opinion but that reasoning certainly applies here. There we had a treating physician also had treating notes but one of the reasons that the ALJ provided to discount that opinion is because on that check back form when asked to provide an explanation for the debilitating limitations he assessed. I believe the treating physician said the condition is permanent. There was no other explanation and what the court and Ford held was that the ALJ may take into account the quality of the explanation when evaluating a medical opinion and that the ALJ could permissively reject checkoff reports that do not contain explanations or adequate explanations for the basis of their conclusions. Excuse me but it sounds as though there's a lot of stuff besides the check marks. There's a fair amount of stuff on the record from these doctors right? There are treatment notes from Dr. Briggs but one of the reasons that the ALJ provided was that and this is on car 1636 and I'll just quote it that the opinion was not supported by any rationale on the pre-printed two-page form and what the ALJ explained earlier in the paragraph before is that when he was asked to provide an explanation for why the claimant would be absent after three days of work per month the explanation he provided was this was a quote guess based on his status of his treating provider. I would also note that this court is held in Kwan v. Gonzalez. Conjecture and speculation can never replace substantial evidence as the basis for an agency's finding that that site is 428 F3D 883 pinpoint is 885. So under binding authority the fact that the explanations he provided on the form indicated that he was guessing as you also noted Judge Fletcher it also indicated that he encouraged her to come back to treatment rather than apply for disability benefits. As the ALJ found there was no explanations on that form that would support the limitations that he assessed. One thing that troubles me about this case troubles me from the standpoint of against the government is that it the record shows that she tries job after job after job and she discontinues after a month or two or three for pretty much all of them and the explanation appears to be that she just can't do the work in a way that will satisfy the employers. Now the social security cases that I'm familiar with there are two or three failed jobs attempts. This is more than I've ever seen. The ALJ focused on two jobs. I'm not asking about two I'm asking about all of them. Yeah so I wouldn't necessarily say her other work supported the ALJ's finding but I would say that the cashiering job as well as her job with AFLEC did and there's a few reasons for that. First of all the ALJ used that work activity to discount the opinion evidence of her mental limitations. This is Dr. Omer, Pajaja, Morgan and Harmon. One of the reasons the ALJ gave was it was her demonstrated work activity and the ALJ highlighted the fact that she was performing semi-skilled and skilled work first at cashiering and then with AFLEC. Is there any evidence of malingering? I've never seen the word in this file although it's a big file and I might have missed it. Yes however malingering. Yes what? There is no yes there's no malingering? There is some evidence of malingering. Does it just do any of the people evaluating her use the word malingering? Yes. Who does and where? It was oh goodness I don't have the doctor's mind but it's I don't have the doctor in my notes here but it was in the opinion I believe it was on car 1637. It was a doctor that was evaluating her it was her mental capabilities and he found that she would have no I believe it was Dr. Fletcher. He found that she would have no obvious limitation in her mental ability to work. What he assessed was malingering versus somatic symptom disorder. So the ALJ didn't rely on malingering to discount her testimony. The ALJ evaluated that opinion and found it persuasive. One of the basis that he gave is that although she was complaining of debilitating pain he observed no obvious pain behaviors during the exam. It was not the focus of the ALJ's decision but the ALJ did evaluate that opinion. The ALJ did find that opinion persuasive. Now to the extent that we're talking about fibromyalgia we know that this somewhat mysterious elusive disease comes and goes. So the fact that in a particular examination she might not be experiencing pain or describing pain is not inconsistent with fibromyalgia. Is that correct? It's not inconsistent with fibromyalgia generally. It's inconsistent with her testimony in this case. She did not allege that her pain came and go. She alleged that she had chronic constant pain that was 8 out of 10 in severity and sometimes 10 out of 10 in severity. So the fact that she's alleging constant pain and yet there are providers or times in the record that the ALJ pointed out where she's denying pain or where examining physicians are observing no pain behaviors, no acute distress. She has more than one underlying condition. That's also correct. She has a lot of underlying conditions and the fact that on one examination she reports honestly no pain. It seems to me that in effect her honesty of the fact that things come and go is being used against her in some ways by the way the ALJ frames the decision. What is your view on that? A few responses to that. One is again she did not allege her pain came and went. She alleged that she had constant pain and she also alleged that that was 8 out of 10 to 10 so very very severe pain. One example is Dr. Drangwis' examination. He noticed that she was in no distress. He noticed that she quote sat comfortably throughout the examination. He noted that she could walk 20 feet without difficulty. He noted she had complained that she had marked sensitivity to touch which would be a fibromyalgia pain. He observed quote no findings on the exam to substantiate that. So the ALJ relied on that and I'd also note that the ALJ when discounting for example Nurse Hardison's opinion, one of the the sites that the ALJ provided was Dr. Drangwis' exam. All of the sites the ALJ provided when discounting Nurse Hardison's opinion were elsewhere. The ALJ described in more detail elsewhere in the decision. So the ALJ cited to 5F1-5 that was Dr. Drangwis' exam and then in CAR 1634 the ALJ explained in detail those findings. Some that would relate to scoliosis, some that would relate to fibromyalgia, some that would relate to both. Counsel can you address the argument that your friend on the other side made that this is a case rare circumstance in which we should remand for an award of benefits? There are multiple doctors who opined that she would not have disabling limitations. When there are conflicts in the record including that's Tricler, Washington v Kijikazi also speaks to that. This court cannot remand for a finding of disability. We have multiple conflicts in the record. I would also note for her physical limitations every single physician who assessed her functioning believed that she could work with more physical abilities than the ALJ found. The ALJ found her more limited than every single physician possessed. The ALJ discounted the opinions of two non-physicians, a chiropractor and a nurse and the ALJ needed to only provide germane reasons to discount that evidence. But we have ample evidence. You say we can discount Dr. Briggs because he's a chiropractor rather than an MD? That's what you're saying? No, what I'm saying is the standard for discounting his opinion is lower. Because? Because he is a chiropractor. That was my question. Yes, you cannot discount him simply because he is a chiropractor. However, the standard for discounting his opinion is lower under the old medical regulations. I think that's two different ways of saying the same thing. He's being discounted compared to an MD because he's a chiropractor. The ALJ provided germane reasons and that is the standard for discounting a chiropractor. So under the old medical regulations, physicians' opinions get more weight. But with respect to the nurse who has some proximity and this question of how many days might you miss per month, the nurse says and explains due to fibromyalgia cause being episodic depending on activity and amount of stress and then checks the box at four. That's a very clear explanation, isn't it? Why is that discounted? Well, the ALJ didn't rely on her explanation to discount that opinion. The ALJ provided two reasons. One was it wasn't supported by her treatment notes. Her treatment notes do not contain, for example, tender point examinations, which would be objective evidence supporting fibromyalgia. The ALJ cited to treatment notes where she's denying symptoms that would be related to all body pain or fatigue, which also is related to fibromyalgia. The ALJ discusses that on 1636 to 1637. Again, the ALJ cites treatment records saying no acute distress. So her treatment records, at least in terms of her objective findings and in terms of some of the statements that Peterson made to Nurse Hardison, are relatively unremarkable. The ALJ also relied on its inconsistency with other medical records. Nurse Hardison did not base her opinion solely on fibromyalgia, though she did specifically reference fibromyalgia for her days being off work. Correct. She also said scoliosis on CAR 1241. She said because of her scoliosis, she would be unable, severely limited, to perform basic work activities, including sitting, standing, walking, lifting, carrying manipulative, and because of fibromyalgia, she'd have marked limitations, so slightly less in those same areas. The ALJ cited, as I mentioned earlier, to Dr. Drangwist's exam where she's sitting comfortably. She's in no distress. She's walking without difficulty, where he doesn't see findings consistent with her allegations of marked sensitivity to light touch. The ALJ also cites to 21F2. On 1628, the ALJ describes that site as, again, she's denying back pain, joint pain, muscle pain. The ALJ also cites to 31F4, when discounting Nurse Hardison's On CAR 1630, the ALJ explains that site in more detail, where she's saying she's not taking anything for her pain. That's including ibuprofen, Tylenol, heat, or ice. So she's indicating that she's very conservative treatment, if treatment at all, which is also inconsistent with both her allegations, as well as Nurse Hardison's assessment of debilitating pain. Okay, counsel, you're over time. Thank you for your argument. Thank you, Your Honor. This is a lengthy record. There's over 1,900 pages in this record. There's hundreds of pages of chart notes. There's hundreds of pages of chart notes from Dr. Briggs. There's hundreds of pages of chart notes from Yakima Neighborhood Health Services, where both the psychologist, Dr. Omer, who did two disability exams that are both disabling, and the nurse practitioner with the doctor's degree, ARNP, Hardison. They both, Dr. Omer and Dr. Hardison, both worked at Yakima Neighborhood Health Services. The only contrary evidence in this file are two consultative exams that were done early in 2017 by Dr. Drangas and Dr. Liddell. They didn't have Yakima Neighborhood Health Services records. They didn't have all of Dr. Briggs' records. Most of these records were after May of 2017 when they did this. As soon as she filed for the claim, Social Security sent her out for two independent one-time exams, one physical and one mental. That's what the ALJ latest had on those exams. He said, I give them great weight because they saw the person. Well, back then, that was part of the hierarchy, but the highest hierarchy was a provider that saw the person and the length of the treatment. He doesn't mention that. In case law in the Ninth Circuit, it says that is enough for reversible error alone if the ALJ doesn't consider the factors of the treatment and the length of the treatment. If we remand for a ward of benefits, I get what happens. That's a ward of benefits. On the other hand, if we do not remand for a ward of benefits, but rather remand for something else, what are we remanding for? We're remanding for, I would say, for legal error because the ALJ credited Dr. Klein and the V.E. clearly said that she could not work and would be disabled and would lose her jobs as she did. So that should be re-evaluated. We'd want to remand because the ALJ gave in his RFC, residual functional capacity, he said she can only interact with supervisors occasionally. That's significant because the Ninth Circuit in an unpublished decision just recently remanded for immediate ward of benefits on the same facts where the person, the ALJ said they could only occasionally interact with supervisors and the V.E. testified during the training period that more than occasional interaction with supervisors is required. The vocational expert in this case, Ms. Kramer, that had the 30-some years of experience, actually wrote a letter to the ALJ in response to interrogatories after the hearing that's in the file and said that a person during the training period needs more than two and two-thirds hours. That's the higher end of occasional is two and two-thirds hours because it's up to one-third of the workday. Anything more than that is frequent. Said they would need that. So this is the exact same case where the RFC for occasional supervision because she's limited in how much she can deal with other people because she can't get through the training period on that and that's another indication of why she lost some of her jobs. Counsel, can you take a moment here to wrap up? Your time is up. Yeah, I think I'm done, Your Honor. Thank you so much. All right. Thank you very much. Thank you to both counsel for your argument. This case is now submitted.
judges: McKEOWN, FLETCHER, DESAI